IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JESS MULLANIX,<br><br>        Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>        Defendant. | 8:15-CV-446<br><br>MEMORANDUM AND ORDER |

The plaintiff, Jess Mullanix, alleges that he was sexually harassed by a coworker while employed by the defendant, Union Pacific Railroad (UP), in 2014 and 2015. Mullanix claims that after he reported those incidents, UP retaliated against him by changing his position and cutting his pay. He further alleges that UP discriminated against him on account of his disability, and retaliated against him for requesting medical leave under the Family Medical Leave Act.

Mullanix has sued UP for disability discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., and Rehabilitation Act; hostile work environment sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; and unlawful retaliation under the ADA and Title VII. UP moves for summary judgment, arguing that Mullanix's claims fail as a matter of law. For the reasons discussed below, UP's motion will be granted.

BACKGROUND

The following facts are not meaningfully disputed. Jess Mullanix began his employment with UP in 2011 as a utility clerk. The following year,

Mullanix was promoted to an internal support services position, which he held until 2015. Filing 28-1 at 3. In that role, Mullanix worked directly with crew dispatchers and managers, fielding their questions and assisting with technical support. Filing 28-1 at 7-8. One of those managers was a UP employee named William Bowman.

(a) Alleged Harassment

Mullanix claims that Bowman harassed him on at least four separate occasions beginning in 2014. The first incident, Mullanix alleges, occurred on June 19 when Mullanix left his work station to use the restroom. Filing 28-1 at 8. Mullanix says that he was standing at the urinal when Bowman approached him and asked if he could "piss on demand . . . can you take your cock and can you piss on demand?" Filing 28-1 at 8. After a short back-and-forth, Bowman left the restroom, and Mullanix returned to his work station. Filing 28-1 at 8. The entire incident—from Bowman entering the restroom to exiting—lasted approximately one minute. Filing 28-1 at 8.

Bothered by the encounter, Mullanix reported the incident to Bowman's supervisor, Sara Foust, who sent Bowman home for the night. Filing 27 at 5; filing 28-1 at 8; filing 28-5 at 2. Bowman later admitted to Foust that he "said something in poor taste" to Mullanix while the two men were in the restroom, attributing the comment to their shared military experience. Filing 28-6 at 2. Bowman agreed to treat Mullanix "[j]ust like normal" and to act as if "nothing had happened" until Foust could work out a resolution between the parties. Filing 28-6 at 3. Meanwhile, within a 24-hour span, Mullanix had reported the incident to two additional sources: UP's "Values Line," which is a means by which employees can report problems or concerns, and Jim Swan, Mullanix's local union chairman. Filing 28-1 at 8-9; filing 28-8 at 1.

The second alleged incident occurred two days later while Mullanix was working in a shared cubicle with Matthew Besse. Filing 28-1 at 9. According to Mullanix, Bowman approached his work space 6 times over a 30 minute period while Mullanix was on the phone with a different crew manager. Filing 28-1 at 10. Besse, who was unoccupied at the time, eventually asked Bowman how he could help, but Bowman allegedly insisted on speaking with Mullanix. *See* filing 28-1 at 9-10. Mullanix says that immediately upon hanging up the phone, Bowman pulled up a chair and "scooted over as close as he could to me, put his leg touching mine, and he said, you know, you and I are like brothers. I pay union dues just like you do." Filing 28-1 at 10. Mullanix claims that he walked away from Bowman and then reported the incident to Foust and UP's Values Line. Filing 28-1 at 10. Foust sent Bowman home a second time before the end of his shift.

Several conversations with UP management followed. For example, Mullanix spoke with Foust after the second alleged incident, telling her that he "wasn't interested in having a relationship with Mr. Bowman" because Bowman was "talking about things that guys don't normally talk about with each other." Filing 28-1 at 11. Mullanix also spoke with his direct supervisor, Mark Applegate. Filing 28-1 at 12. Applegate, like Foust, acknowledged the improper nature of Bowman's alleged comments, but encouraged Mullanix to maintain a professional relationship with him. *See* filing 28-1 at 12.

Mullanix also learned of an internal investigation by UP's Equal Employment Opportunity (EEO) division, which found that Bowman had, in fact, violated the company's sexual harassment policy. Filing 27 at 7; filing 31-4 at 7. As a result, Bowman was required to take an EEO class and sign an official letter of reprimand. Filing 27 at 8-9; filing 28-9 at 3. He was also

instructed to stay out of the restroom when Mullanix was using it and to limit his conversations with Mullanix to work-related topics. Filing 27 at 8.

Two months passed without incident. However, on or around August 8, Mullanix reported that Bowman had followed him into the restroom, looked at him, and left. As Mullanix explained:

> [Bowman] would have been at his desk. I was at mine. I got up, walked to the bathroom. He got up behind me, walked to the bathroom. I'm going to the bathroom. He looks in the door, walks out, leaves.

Filing 31-3 at 20. Then, in January 2015, Mullanix reported a similar incident in which Bowman allegedly followed him out to UP's parking garage. As to that incident, Mullanix claims that Bowman "stalked" him "to the edge of the parking lot" and then "watched [him] walk to [his] car and then get in[.]" Filing 31-3 at 20. According to Mullanix, that incident, coupled with the prior encounters, made him uncomfortable in his job and encouraged him to "get out of the department where Bowman was working." Filing 31-3 at 25.

(b) Train Dispatcher Position

In September 2014, before the alleged parking lot incident, Mullanix applied for a position as a train dispatcher. Filing 31-3 at 25. The following month, UP notified Mullanix that he was selected for the position, contingent upon his successful completion of a background investigation and a pre-placement physical exam. Given those contingencies, the letter recommended that Mullanix "not giv[e] notice to [his] current employer or incur[] any expense in reliance upon th[e] offer[.]" Filing 28-2 at 6. Mullanix's tentative start date for the new position was January 5, 2015.

Shortly after receiving the offer, Mullanix sent a text message to his supervisor, Applegate, regarding the news. He informed Applegate that he "had been selected to move forward in the train dispatching," and that he "[didn't] think the class starts until January." Filing 28-2 at 8. According to Applegate, he interpreted the message as a notification that Mullanix had been hired as a train dispatcher effective January 2015. Filing 28-3 at 5. So, believing Mullanix's job would be vacant, Applegate posted the position and began accepting applications. By the end of November, Applegate had awarded the position to another employee. Filing 28-3 at 8-9.

By December, Mullanix had expressed second thoughts about the possibility of switching jobs. In an email to a UP director, Mullanix wrote "my wife has assured me that we will not be able to cover our expenses and will incur a major hardship on my family if I go into this position at [the salary offered]." Filing 28-2 at 10. In a second email, sent later in the month, he told the director that his wife was still "very upset about me going to Train Dispatching," and requested that he "stay in [his] current position." Filing 28-2 at 12. The director responded to Mullanix's request, offering to delay his start date until July 2015, at which point a pay raise would become effective. Filing 31-3 at 30. Mullanix responded immediately, writing "[s]tarting in July sounds great with a higher rate of pay." Filing 28-2 at 13.

After that arrangement was finalized, Mullanix's physician notified UP that Mullanix could not be cleared for the train dispatching position. "After careful review of [the] patient's chart," the physician wrote, "I do NOT feel that [Mullanix] is fit for duty for the role of train dispatcher." Filing 28-2 at 18. Citing that recommendation, UP "revoked" its conditional offer of employment in a December 23 letter to Mullanix. *See* filing 28-2 at 22. And because his prior position had already been filled, UP management allegedly

informed Mullanix that his only option was to bid on an open position in crew dispatching. Filing 31-3 at 40. Mullanix bid on and was accepted to the position, which he held for approximately one month until his transfer to UP's customer service department. Mullanix remains in that position today. Filing 28-1 at 33-34.

STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver*

informed Mullanix that his only option was to bid on an open position in crew dispatching. Filing 31-3 at 40. Mullanix bid on and was accepted to the position, which he held for approximately one month until his transfer to UP's customer service department. Mullanix remains in that position today. Filing 28-1 at 33-34.

STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver*

*Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## DISCUSSION

Mullanix claims that he was subjected to unlawful sexual harassment and retaliation. Filing 1 at 9-12. He also claims that UP discriminated against him on account of his disability by, among other things, demoting him and cutting his salary. Filing 1 at 12. UP moves for summary judgment, arguing that Mullanix's claims fail as a matter of law.

### SEXUAL HARASSMENT: HOSTILE WORK ENVIRONMENT

Mullanix alleges that Bowman, his co-employee, subjected him to unwelcome sexual harassment. To establish a prima facie case against an employer for sexual harassment by one of its employees, Mullanix must show: (1) he is a member of a protected group; (2) was the victim of unwelcomed sexual harassment; (3) the harassment occurred because of his sex; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the employer knew or should have known of the harassment and failed to take proper action. *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016). UP moves for summary judgment at step four, arguing that Bowman's alleged harassment did not affect a term, condition, or privilege of Mullanix's employment. Filing 27 at 24.

Workplace harassment affects a term or condition of employment when it is "severe or pervasive[.]" *Duncan v. General Motor Corp.*, 300 F.3d 928, 934 (8th Cir. 2002). Thus, to be actionable, the claimant must show that the workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (internal quotation marks omitted). In determining whether the

conduct is sufficiently severe or pervasive, the Court looks to the totality of circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003) (conduct must be "extreme").

Mullanix supports his prima facie case with reference to the four alleged incidents described above. To that end, Mullanix contends that Bowman's harassment was "severe and physical" as evidenced by Bowman's touching of Mullanix's leg, and generally "humiliating" as demonstrated by Bowman's references to "sex and sexual innuendo." Filing 31 at 46-47.

Viewing the evidence in the light most favorable to Mullanix, the Court finds that the alleged incidents fail, as a matter of law, to clear the "high threshold" necessary to establish an actionable case based on a hostile work environment. Indeed, the Eighth Circuit Court of Appeals has routinely rejected hostile work environment claims premised upon facts far more egregious than the conduct alleged here. For example, in *Duncan*, the Eighth Circuit, reversing a jury verdict, rejected a hostile work environment claim where a supervisor, among other harassing conduct: requested a sexual relationship from the plaintiff; touched the plaintiff's hand on multiple occasions; displayed a pacifier that was shaped like a penis; displayed a computer screen with a picture of a naked woman; and created a recruitment poster that portrayed the plaintiff as the president and CEO of the "Man Hater's Club of America." *Duncan*, 300 F.3d at 932-35. That behavior was "boorish, chauvinistic, and decidedly immature," the appellate court

determined, but did not amount to an objectively hostile work environment under Title VII. *Id.* at 935.

Here, the record indicates that Bowman approached Mullanix in the men's restroom and asked him if he could "piss on demand." Filing 28-1 at 8; filing 28-6 at 2. Mullanix further alleges that Bowman approached him on three additional occasions over a 6-month period and (1) touched his leg against Mullanix's; (2) followed Mullanix into the restroom; and (3) "stalked" Mullanix as he walked to the parking garage and entered his vehicle. *See* filing 31 at 45-49. While those encounters may have been uncomfortable for Mullanix, they are not sufficiently severe or pervasive, when considered as a whole, to satisfy the high threshold for actionable harm. *See Alagna,* 324 F.3d at 980. Accordingly, Mullanix's sexual harassment claim fails as a matter of law, and UP's motion for summary as to that claim will be granted.

## DISABILITY DISCRIMINATION

Mullanix also claims that he was discriminated against on account of his disability in violation of the ADA and Rehabilitation Act.[1] Filing 1 at 7-11. To support that claim, Mullanix points to UP's actions immediately following his conditional offer for the train supervisor position. Specifically, Mullanix suggests that his supervisor, Applegate, used the conditional offer as an excuse to "push[] him out" of his internal services position because, as Mullanix alleges, he has a disability.[2] Filing 31 at 50. Applegate achieved that goal, Mullanix says, by immediately posting and filling his position

---

[1] The ADA and Rehabilitation Act are virtually identical, so "cases interpreting either are applicable and interchangeable." *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir. 1998) (internal citation omitted).

[2] The nature of Mullanix's disability is not entirely clear from the record. But UP does not challenge that fact, so the Court need not address it here.

before Mullanix was cleared for the new role. Filing 31 at 51. Thus, when Mullanix was deemed medically unfit for the position, he was forced to take a different job with less pay and fewer benefits. *See* filing 1 at 10.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination, Mullanix must show that he (1) has a qualifying disability under the ADA; (2) is a qualified individual under the ADA; and (3) was subjected to an adverse employment action due to his disability. *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016). Upon establishing a prima facie case, the burden shifts to UP to articulate a legitimate, nondiscriminatory reason for adverse action. After articulating such a reason, the burden shifts back to Mullanix to present evidence that the reason is pretextual. *See Wilking v. County of Ramsey*, 153 F.3d 869, 872-73 (8th Cir. 1998).

Even assuming that Mullanix could satisfy his prima facie burden, UP has offered a legitimate, non-discriminatory reason for transferring Mullanix's position. Indeed, as noted above, Applegate posted the position *after* Mullanix informed him that he had been "selected to move forward in train dispatching[.]" Filing 28-2 at 8. Believing that Mullanix was leaving his position, Applegate posted and filled the job to avoid a January vacancy. Filing 28-3 at 5. It was only after the new employee had been hired, and Mullanix was deemed medically ineligible, that Applegate learned of Mullanix's desire to stay put. And by that time, UP claims it was too late—noting that it "could not oust [Mullanix's replacement] from the [] position to reinstate Mullanix[.]" Filing 27 at 29.

Mullanix argues that UP's stated reason for the transfer is pretextual because a different employee, Mindy Totten, was allowed to return to her previous position under nearly identical circumstances. *See* filing 31 at 55. But as UP correctly points out, that comparison is not relevant here because Mullanix and Totten are not "similarly situated." *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 485 (8th Cir. 1997) (comparison to other employees is valid only if employees are similarly situated to plaintiff). Indeed, as Mullanix acknowledges, Totten was a crew manager, not an internal support services employee. Filing 31 at 55; filing 32 at 14. So, even assuming that Totten was allowed to return to her previous position, that action "is not credible evidence" that could raise a genuine issue of fact regarding UP's motivation for transferring Mullanix. *Herrero,* 109 F.3d at 485; *see Nitschke v. McDonnell Douglas Corp.*, 68 F.3d 249, 252 (8th Cir. 1995). Accordingly, because no genuine issues of fact remain, the Court will grant UP's motion as to Mullanix's claims under the ADA and Rehabilitation Act.

RETALIATION

Mullanix next contends that UP "demoted" him in retaliation for reporting Bowman's alleged harassment. That claim is premised on the same factual basis described above—*i.e.*, that Applegate pushed him out of internal services by posting and filling his job immediately after Mullanix received the conditional offer for train dispatching. Filing 1 at 11-12.

Without direct evidence of a retaliatory motive, Mullanix's claim depends on the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under that framework, the initial burden is on Mullanix to establish a prima facie case that would permit a reasonable jury to find that (1) he engaged in protected conduct, (2) he suffered an adverse employment action, and (3) the adverse action was causally linked to the

protected conduct. *Stewart v. Indep. School Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). The burden then shifts to UP to articulate a legitimate, non-retaliatory reason for the adverse action, then back to Mullanix to show that this reason is a pretext for retaliation. *Id*.

UP moves for summary judgment at step three, arguing that no casual nexus exists between Mullanix's reports of harassment and his eventual transfer to the company's customer service division. *See* filing 27 at 28. To overcome that motion, Mullanix must show that his protected activity was a but-for cause of his employer's adverse action. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 888 (8th Cir. 2015). Mullanix can satisfy that standard through circumstantial evidence, such as timing between the protected act and the adverse employment action, the employer's treatment of the employee, the employer's reaction to the protected conduct, or inconsistent or contradictory explanations for the adverse employment action. *See Kwan v. Andalex Group, LLC*, 737 F.3d 834, 846 (8th Cir. 2013); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004).

Mullanix has not satisfied his burden at step three, and the Court will therefore grant UP's motion on those grounds. Indeed, in response to UP's argument, Mullanix merely reiterates his basic allegations regarding Bowman's alleged harassment, and claims that Applegate "gave [his] job away and refused to undo the posting or allow him to return or bump back into his position." Filing 31 at 54. But Mullanix has presented no evidence—circumstantial or otherwise—to support any causal connection between the events. And his failure to do so is particularly noteworthy here, where UP's alleged retaliatory actions occurred four months *after* Mullanix's reports of harassment. *See* filing 27 at 28. As the Eighth Circuit has recognized, that gap in time is insufficient to create an inference of a causal connection

between protected conduct and an adverse action. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1149 (8th Cir. 2008); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir. 2003).

### REMAINING ISSUE

Although not entirely clear from the record, Mullanix seems to allege an additional claim of discrimination and retaliation based on his use of medical leave under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*.[3] Filing 1 at 8. Those claims appear to stem from a separate attempt by Mullanix, on or around January 15, 2015, to regain a position in the internal support services division. Around that time, UP posted an opening in the division after a different employee, Knick Tottens, left his position. *See* filing 28-1 at 34. Mullanix applied for the job, but was ultimately turned down because, as Mullanix alleges, Applegate informed him that he had taken too much medical leave. *See* filing 1 at 8; filing 28-1 at 37; Filing 28-1 at 20.

To the extent that Mullanix seeks relief on those grounds, the Court concludes that UP is entitled to summary judgment. Indeed, as UP correctly points out, the alleged facts surrounding Mullanix's claims occurred after he had submitted his final complaint with the Nebraska Equal Opportunity Commission (NEOC). Filing 27 at 32. In other words, unlike the claims addressed above, the NEOC neither considered nor adjudicated Mullanix's allegations regarding UP's decision to deny him Tottens' open position. And that is significant because, as the Supreme Court has made clear, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" that must be considered by an administrative body before the claim is filed in federal

---

[3] The lack of clarity surrounding this claim stems in part from Mullanix's failure to address it, despite UP's arguments for dismissal, in his response brief.

court. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (internal quotation marks omitted); *see Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850-51 (8th Cir. 2012); *see also* 42 U.S.C. § 12117(a) (incorporating the enforcement provisions of Title VII).[4] Thus, because Mullanix has not exhausted his additional discrimination and retaliation claims, UP is entitled to summary judgment.

## CONCLUSION

Therefore, the Court will grant UP's motion for summary judgment and dismiss Mullanix's complaint in its entirety.

IT IS ORDERED:

1. UP's motion for summary judgment (filing 26) is granted.

2. Mullanix's complaint is dismissed.

3. A separate judgment will be entered.

Dated this 22nd day of November, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge

---

[4] And because UP's decision in this respect was a "discrete act" that occurred subsequent to Mullanix's timely filed administrative charges, it does not fall within the Eighth Circuit's "considerably narrow[]" exception to administrative exhaustion. *Wedow v. City of Kansas City*, 442 F.3d 661, 672-73 (8th Cir. 2006); *see Richter*, 686 F.3d at 850-51.